# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**FIDELITY NATIONAL TITLE INSURANCE COMPANY,**

                **Plaintiff,**

**-vs-**                        **Case No.  6:11-cv-1438-Orl-28DAB**

**HOUSTON CASUALTY COMPANY,**

                **Defendant.**

_____

## ORDER

This matter is an insurance coverage dispute between Plaintiff, Fidelity National Title Insurance Company ("Fidelity"), and Defendant, Houston Casualty Company ("Houston"). Fidelity filed a one-count Complaint (Doc.1) for breach of contract, alleging that Houston failed to defend or indemnify Fidelity's policy-issuing agent as allegedly required by a Houston professional liability insurance policy. In its Answer (Doc. 11), Houston asserted a counterclaim seeking a declaration that it had no duty to defend or indemnify Fidelity's policy-issuing agent.[1] The case is currently before the Court on the parties' cross-motions for summary judgment (Docs. 22 & 26).[2] As set forth below, Fidelity's motion is denied and

_____

[1]In the alternative, Houston requested a judgment declaring that its policy is subject to rescission. (<u>See</u> Doc. 11 at 14). In light of the rulings in this Order, Houston's alternative request regarding rescission has been rendered moot.

[2]The pertinent filings are: (1) Fidelity's Motion for Summary Final Judgment (Doc. 22); (2) Houston's Response to Fidelity's Motion for Summary Judgment and Cross-Motion for Summary Judgment (Doc. 26); (3) Fidelity's Reply to Houston's Response to Fidelity's Motion for Summary Judgment (Doc. 28); and (4) Fidelity's Response to Houston's Cross-Motion for

Houston's motion is granted.

## I.  Background

At all times relevant hereto, non-party Perkins Real Estate Services, Inc. ("Perkins")[3] was in the business of providing title insurance and escrow services in connection with real estate transactions.  (DeLeo Aff., Doc. 42, ¶ 2).  Pursuant to an Issuing Agency Agreement ("IAA"), Perkins was an authorized title insurance policy-issuing agent of Fidelity.  (See DeLeo Aff. ¶ 2; IAA, Ex. B to Doc. 26).  The IAA provided that if Fidelity was required to pay a title insurance claim due to the negligence of Perkins, Perkins would be required to reimburse Fidelity therefor.  (See IAA at 2 ("Allocation of Losses") and 4 (definition of "Loss")).  The IAA also required Perkins to carry errors and omissions liability insurance.  (See id. at 5).

In late October 2008, Perkins applied for and obtained a Professional Liability Errors & Omissions Insurance Policy ("the Policy") from Houston.  The Policy is a claims-made policy with a policy period of November 1, 2008 to November 1, 2009 and a retroactive date of November 4, 2003.  (Policy, Ex. A. to Doc. 26) Subject to certain exclusions, the "Coverage" portion of the Policy provides that Houston "shall pay on behalf of [Perkins] any Loss and Claim Expenses . . . as [Perkins] . . . shall become legally obligated to pay for Claim or Claims first made against [Perkins] during the Policy Period by reason of any Wrongful Act

---

Summary Judgment (Doc. 29).  Additionally, with permission of the Court, (see Docs. 47 & 51), Houston has filed a Supplemental Response (Doc. 52) and Fidelity has filed a Response (Doc. 53) thereto.

[3]Perkins did business under the name "Fidelity Land Title and Escrow" but is referred to herein as Perkins.

by [Perkins] provided always that [Perkins] has no knowledge of such Wrongful Act prior to the Inception Date of this Policy and further provided that such Wrongful Act took place subsequent to the Retroactive Date."  (Id.).

Two years earlier, on November 1, 2006, Perkins handled the closing of a $225,000 real estate transaction involving undeveloped land on Dean Road in Orlando, Florida.  The seller in that transaction was Jose A. Ramos ("Ramos"), and the purchaser was Classic Construction, Inc. ("Classic").   In connection with that transaction, a title search was performed and a title insurance policy was issued by Fidelity to Classic.  The chain of title included a quitclaim deed from Corina Altagracia Costa-Cruz ("Costa-Cruz") to Ramos that was notarized on August 8, 2005 and recorded in the public records more than a year later—on August 11, 2006.  The sale from Ramos to Classic was via a general warranty deed that was signed at the November 1, 2006 closing and recorded in the public records on November 8, 2006; that deed is notarized by Shannon Hobbs ("Hobbs"), a Perkins employee.

One month after the closing, in a letter to Perkins and Hobbs dated December 1, 2006, an attorney for the son of Costa-Cruz asserted that Costa-Cruz had not sold the property to Ramos.  (Dec. 1, 2006 Letter, Ex. 14 to Doc. 22).  The attorney explained in the letter that when Costa-Cruz did not receive her 2006 property tax bill for the Dean Road property, her son inquired with the Orange County Property Appraiser regarding the bill.  The Property Appraiser provided Costa-Cruz's son with copies of the quitclaim deed and the general warranty deed.  Costa-Cruz's son advised that Costa-Cruz is a full-time resident of Puerto Rico and was not in Orange County, Florida, on August 8, 2005 when the quitclaim

-3-

deed was purportedly signed by her.  Costa-Cruz denied signing the quitclaim deed; did not

know who Ramos was; did not know of either of the addresses listed as hers on the quitclaim

deed; and does not have a driver's license—contrary to the notary's indication on the

quitclaim deed that a driver's license was presented by Costa-Cruz as identification.

After recounting these events in the letter, the attorney for Costa-Cruz's son then

stated:

> Thus, pursuant to the information provided to the undersigned, [Costa-Cruz's] signature on the Quit Claim Deed purporting to vest title to the property in [Ramos] is an apparent forgery, meaning that the Quit Claim Deed above described was and is void ab initio and legally ineffective to transfer title . . . , and thus rendering the subsequent General Warranty Deed from Mr. [Ramos] in favor of Classic Construction, Inc. . . . legally ineffective as well.
>
> . . .
>
> [Costa-Cruz's son] and [Costa-Cruz] reserve all rights and remedies with respect to any and all parties responsible for the wrongful execution, delivery, notarization and/or recording of any instruments purporting to transfer, encumber or cloud title to [the] property.  Furthermore, [Costa-Cruz's son] and [Costa-Cruz] expect that parties responsible for the foregoing shall bear any and all expenses associated with expunging instruments wrongfully executed, delivered, notarized and/or recorded with respect to [the] property from the Public Records, including, without limitation, quieting title to the property, and that said responsible parties shall be liable for any and all damages suffered and incurred by [either of them] . . . .

(Dec. 1, 2006 Letter at 2) (emphasis removed).  The attorney demanded that Classic

immediately vacate the property.  (Id.).

On December 4, 2006, Perkins sent the December 1, 2006 letter to Fidelity, referring

to it as "a claim letter that we received . . . claiming that a quit claim deed in the chain of title

was forged."  (Ex. E to Doc. 26).  Fidelity acknowledged receipt of the letter and informed

Perkins that Fidelity employee Stacey Alfonso would be handling the matter.  (Ex. G to Doc. 26).

In 2007, an action to quiet title to the property was filed by or on behalf of Classic.[4] During that litigation, Zindia Mendoza ("Mendoza"), the notary who had notarized the quitclaim deed from Costa-Cruz to Ramos on August 8, 2005, acknowledged in her deposition that in fact she had never met Costa-Cruz; that she never witnessed Costa-Cruz's signature; and that she was never presented with identification of Costa-Cruz but only a driver's license of Ramos.  In light of this testimony, Classic abandoned its claims to the Dean Road property, and Fidelity—pursuant to the title insurance policy it had issued to Classic—paid the policy limits of $225,000 to Classic.

Later in 2007, Fidelity filed a lawsuit in state court against Mendoza and the law firm by which she was employed, alleging that their negligence caused Fidelity to have to pay its policy limits to Classic.[5]  In November 2008, as part of that lawsuit, the law firm filed a third-party complaint against Perkins and its employee, Shannon Hobbs, for negligence.  (Ex. I to Doc. 26).  The law firm alleged that Perkins had "insured and closed the subject transaction while having knowledge of information that if investigated would have disclosed the alleged wrongdoing of Mendoza and Ramos."  (Id. at 4).

On December 29, 2008, Fidelity, through counsel, sent Perkins a letter recounting the

---

[4]Case No. 07-CA-2002 in the Circuit Court of the Ninth Judicial Circuit Court for Orange County, Florida.

[5]Case No. 07-CA-0017585-O in the Circuit Court of the Ninth Judicial Circuit for Orange County, Florida.

course of the litigation, noting that Perkins was alleged to have acted negligently, and demanding that Perkins pay Fidelity its unsatisfied damages.  (Dec. 29, 2008 Letter, Ex. J to Doc. 26).[6]  In a letter dated December 31, 2008, Perkins advised Houston[7] of Fidelity's claim against Perkins, enclosing a copy of the December 29 letter.  (Ex. K to Doc. 26).  Five days later, on January 5, 2009, Perkins sent Houston another letter and a copy of the third-party complaint that had been filed against it by Mendoza and the law firm.  (Ex. 4 to Doc. 22).

On January 23, 2009, Houston informed Perkins that it had received the demand letter from Fidelity to Perkins and the third-party complaint filed by the law firm and Mendoza against Perkins and had "determined that it has no obligation under the Policy either to defend or indemnify [Perkins] and/or Shannon Hobbs in connection with" that matter.  (Ex. 5 to Doc. 22).  The denial cited several policy provisions and expressly denied coverage on the basis that Perkins had knowledge of the "Wrongful Acts" at issue prior to the November 1, 2008 inception date of the policy.  (See id. at 3-6).  The denial letter also noted two "No" answers on Perkins's insurance application regarding Perkins's knowledge of acts, errors, omissions, or claims.  (See id. at 6).  A week later, Perkins asked Houston to reconsider its position, (see Ex. 6 to Doc. 22), but in a letter dated March 11, 2009, Houston maintained

_____

[6]As noted in that letter, Fidelity was also required to pay—in addition to the $225,000 policy limits—fees and costs of more than $40,000.00, but as of that time Fidelity had been able to recover $7,500.00 from Mendoza's notary bond; Fidelity thus demanded $257,500.00 from Perkins.  (Ex. J to Doc. 26 at 3-4).

[7]Perkins reported the claim to Houston's agent, Professional Indemnity Agency, Inc. "PIA"); thus, it is PIA's name that appears on the correspondence in the record.

its denial of coverage, (see Ex. 7 to Doc. 22).

On March 23, 2011—two years after Houston's last denial of coverage—Fidelity filed an Amended Complaint in its state-court lawsuit, adding Perkins as a defendant.  (Ex. 8 to Doc. 22).  Fidelity alleged that Perkins—by failing to discover that Costa-Cruz's signature on the quitclaim deed was a forgery and that Ramos did not actually own the property—had breached the IAA and had acted negligently.  (Id.).  On March 31, 2011, Perkins forwarded the Amended Complaint to Houston and demanded that Houston defend and indemnify it in that suit.  (Ex. 9 to Doc. 22).  In a letter dated May 10, 2011, Houston "continue[d] its position that it does not have a duty or obligation to defend or indemnify" Perkins.  (Ex. 10 to Doc. 22).

Fidelity, Perkins, and the notary's law firm entered into a settlement agreement on May 24, 2011.  (See Ex. O to Doc. 26).  In that document, Perkins agreed to the entry of a consent judgment and Fidelity agreed not to execute upon that judgment in consideration for Perkins's assignment to Fidelity of Perkins's rights and interests in its insurance contract with Houston. (Settlement Agreement at 2).  The consent judgment was signed by the state court judge on June 13, 2011, (see Ex. O to Doc. 26), and Fidelity filed this lawsuit against Houston on August 29, 2011, (Compl., Doc. 1).[8]

## II.  Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[8]As stated in the Complaint, "Fidelity brings this action in its own name [and] as assignee of the insured, Perkins, and is otherwise the real party in interest."  (Doc. 1 at 5).

Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  "Summary judgment is appropriate 'in declaratory judgment actions seeking a declaration [as to insurance coverage] when the insurer's duty, if any, rests solely on the applicability of the insurance policy, the construction and effect of which is a matter of law.'"  TIG Ins. Co. v. Smart Sch., 401 F. Supp. 2d 1334, 1337 (S.D. Fla. 2005) (quoting Northland Cas. Co. v. HBE Corp., 160 F. Supp. 2d 1348, 1358 (M.D. Fla. 2001)).

"Cross motions for summary judgment do not change the standard."  Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007).  "Even where the parties file cross motions pursuant to Rule 56, summary judgment is inappropriate if disputes remain as to material facts."  Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1030 (10th Cir. 2007).

### III.  Discussion

In its motion, Houston makes three arguments for summary judgment in its favor, and in its motion Fidelity makes one.  Each party claims entitlement to judgment on the issue of denial of coverage based on "No" answers Perkins gave to questions on its application for the Policy.  Houston additionally asserts that Perkins had knowledge of the subject "Wrongful Act" prior to the inception date of the Policy and that the "Claim" was not first made against Perkins during the policy period.  These issues are addressed in turn.

### A.  Application Condition

Houston asserts that two "No" answers that Perkins made on its insurance application

were incorrect and material and therefore bar coverage.  Fidelity counters that the answers

were not misrepresentations and do not avoid coverage.  Houston's position has merit and

entitles it to summary judgment.

On the application that was completed by Perkins on October 23, 2008, Perkins

answered "No" to Questions 21 and 22:  "21.  Does any person to be insured have

knowledge or information of any act, error or omission which might reasonably be expected

to give rise to a claim against him/her[?]" and "22.  After inquiry have any claims been made

against any proposed insured(s) during the past three (3) years?" (Application for Insurance,

Ex. C to Doc. 26, at 4).  Beneath these questions, the application stated:  "It is understood

and agreed that with respect to questions 20, 21 and 22 above, that if such knowledge or

information exists any claim or action arising therefrom is excluded from this proposed

coverage." (Id.) (emphasis removed).  Moreover, one of the express "Conditions" in the

Policy provides:

> Application
> By acceptance of this Policy, [Perkins] agree[s] that the
> statements in the application are personal representations, that
> they shall be deemed material and that this Policy is issued in
> reliance upon the truth of such representations and that this
> Policy embodies all agreements existing between [Perkins] and
> [Houston] or any of their agents relating to this insurance.

(Policy at 8).

Fidelity contends that Perkins did not make a misstatement on the insurance

application, asserting that as of the date of the application Perkins had no "knowledge or

information of any act, error or omission which might reasonably be expected to give rise to

a claim."  This contention is rejected.  Fidelity focuses on what Perkins actually believed

about whether a claim would be made against it, but such a subjective test applies only to the "knowledge" aspect of the application question, while an objective test applies to the "might reasonably be expected to give rise to a claim" component. Maher & Williams v. ACE Am. Ins. Co., Civ. No. 3:08cv1191(JBA), 2010 WL 3546234, at *11 (D. Conn. Sept. 3, 2010) ("Courts applying prior-knowledge exclusions to claims-made insurance policies use 'a two-part, subjective-objective test' to determine whether the exclusion bars coverage for a particular claim, asking 'first, whether the insured had actual knowledge of a [wrongful act], a subjective inquiry; and second, whether a reasonable professional in the insured's position might expect a claim or suit to result, an objective inquiry.'"(alteration in original) (emphasis removed)); accord Ulster Cnty. v. CSI, Inc., 945 N.Y.S.2d 480, 482 (App. Div. 2012); see also Cuthill & Eddy, LLC v. Cont'l Cas. Co., 784 F. Supp. 2d 1331, 1337 (M.D. Fla. 2011) ("Courts routinely affirm the denial of coverage where an insurance policy contains an unambiguous 'prior knowledge' provision and where an insured has knowledge, prior to the effective date of the policy, of acts or omissions that might reasonably provide the basis for a claim."); Coregis Ins. Co. v. McCollum, 961 F. Supp. 1572, 1579 (M.D. Fla. 1997).[9]  These tests are met in this case; the record evidence demonstrates that as of October and November 2008 Perkins knew of its actions surrounding the Dean Road property transaction and as an objective matter, those actions might reasonably be expected to give rise to a claim.

_____

[9]Some of the cases cited discuss "prior knowledge" policy provisions or exclusions rather than "prior knowledge" application questions, but the Court finds the analysis equally applicable. Moreover, as noted in the next section of this Order the "application condition" issue overlaps with the "knowledge of wrongful acts" provision raised by Houston.

As evidenced by Perkins's own file notes, on October 12, 2006—nearly two years prior to the inception of the Policy and three weeks before the November 1, 2006 closing on the Dean Road property—a Perkins employee named Rachel had spoken to a Fidelity underwriting employee, David Morgan, and was told that "we [Perkins] need to call [Costa-Cruz] and make sure that she really did sign the deed to Jose Ramos." (Ex. F to Doc. 26). The content of those notes is corroborated by the deposition of Morgan, which was taken during Fidelity's lawsuit against the notary and law firm,[10] and by Morgan's own notes of the October 12 conversation with Rachel. (Morgan Dep., Doc. 25, at 13-15; Morgan's File Notes, Ex. E to Doc. 25).

Morgan explained that his job duties include responding to questions from policy-issuing agents about the circumstances under which Fidelity will issue title-insurance policies. (Doc. 25 at 8).  Agents may contact Fidelity and ask Morgan about problems or concerns that they have, and that is what occurred when the Perkins employee named Rachel contacted him on October 12, 2006.  (Id. at 13-14).  Rachel told Morgan that there was a recent quitclaim deed for no consideration, and Morgan's notes state: "need confirmation of signature on recent [quitclaim] deed." (Id. at 15; Morgan's Notes, Ex. E to Doc. 25, at 2).

---

[10]Another deposition of Morgan was taken during this case and was submitted by Houston—with permission of the Court, (see Docs. 47 & 51)—as supplemental material after the parties' summary judgment filings had been made.  (Ex. B to Doc. 52).  Morgan's testimony in the second deposition is consistent with his testimony in the prior deposition, which was filed in this case by Fidelity with its summary judgment motion; Morgan's second deposition will not be separately discussed.  Houston also submitted as supplemental material the deposition of Mary Oswald, an assistant vice president of Fidelity. (Ex. A to Doc. 52). Her testimony is also consistent with Morgan's testimony on the points noted in the text, and her deposition need not be separately discussed.

He instructed Perkins to try to contact Costa-Cruz.  (Doc. 25 at 35).

As explained by Morgan, the deed from Costa-Cruz to Ramos was a recently recorded quitclaim deed for no consideration; it was seemingly not signed pursuant to a sale closing; it was recorded a year after it was signed; and it was purportedly signed in Florida by an out-of-state resident.  (Id. at 25-28).  These circumstances would lead him to tell an issuing agent to verify that the grantor actually signed the deed, because they are the type of circumstances that are suggestive of a fraudulent deed.  (Id. at 25).[11]

In addition to this evidence of discussions between Perkins and Fidelity regarding concern about the deed from Costa-Cruz to Ramos, it is also undisputed that Perkins received the December 1, 2006 letter from Costa-Cruz's son's attorney and forwarded that letter to Fidelity on December 4, 2006.  (See Ex. E to Doc. 26).  Attached to that correspondence to Fidelity are internal Perkins emails from early December 2006 in which Hobbs was asked whether she recalled if she had contacted Costa-Cruz as Fidelity had instructed; Hobbs responded that she did not recall contacting Costa-Cruz but that many Perkins employees were involved in the Dean Road property file.  (Attach. to Ex. E to Doc. 26).

Furthermore, on December 27, 2006, Perkins's director and president, Karen DeLeo[12]

_____

[11]Morgan explained that Fidelity provides an underwriting manual, seminar materials, bulletins, and checklists to its policy-issuing agents.  (Doc. 25 at 11, 20).  Among these materials are bulletins that alert agents to indicators of potentially forged deeds, including the circumstances noted in the text.  (See Ex. J to Doc. 25).

[12]DeLeo's name was Karen Perkins back in 2006, but she has since married and changed her name.  (See DeLeo Aff. ¶ 1).

("DeLeo"), spoke to Stacey Alfonso—the Fidelity employee who was handling the matter regarding the December 1, 2006 letter that Perkins had forwarded to Fidelity, (<u>see</u> Dec. 7 Letter, Ex. G to Doc. 26)—and made notes of that conversation.  (<u>See</u> DeLeo Aff. ¶ 15).  In those notes, DeLeo indicated that Alfonso told her that an investigator was being hired to research all of the information and that Alfonso even suggested that Perkins's closer might be involved—a suggestion with which DeLeo disagreed.  (Ex. 15 to Doc. 22, entry for 12/27/06; <u>see also</u> DeLeo Aff. ¶ 16).  DeLeo also mentioned in her notes that Alfonso "feels that [Fidelity] will have to pay the [title insurance] policy limits on this claim" and that Alfonso "[s]aid she's not sure that a phone call to verify the signing of the [quitclaim deed] would have helped."  (Ex. 15 to Doc. 22, entry for 12/27/06).  In a note dated March 25, 2008, DeLeo indicated that Fidelity had paid the claim and was going to go after the notary's law firm.  (<u>Id.</u>, entry for 03/25/08).

Thus, unquestionably, as of October 2008 Perkins knew:  that the deed from Costa-Cruz to Ramos was a forgery; that Costa-Cruz was seeking to hold "those responsible" accountable for the cloud on title; that Perkins had been told by Fidelity to confirm Costa-Cruz's signature on the deed prior to closing but that there was no evidence in Perkins's file of that confirmation ever occurring; and that Fidelity had paid its title insurance policy limits to Classic because of the title defect.  Additionally, Perkins knew that the IAA between it and Fidelity required Perkins to comply with Fidelity's manuals, instructions, and bulletins in conducting its title agent services and that it also obligated Perkins to reimburse Fidelity for title insurance policy payouts that were caused by the negligence of Perkins.  This undisputed evidence demonstrates that Perkins "had knowledge or information of an[] act,

error or omission which might reasonably be expected to give rise to a claim against" Perkins.  Thus, Houston did not improperly decline to cover this claim.

Fidelity attempts to avoid this result by arguing that as evidenced by the emails and file notes sent by Perkins to Fidelity in early December 2006, "Perkins made no secret" about its actions, yet Fidelity did not at that time take issue with Perkins's possible failure to contact Costa-Cruz.  (See Pl.'s Resp. Mem., Doc. 29, at 16; Pl.'s Resp. to Def.'s Supplemental Resp., Doc. 53, at 4).  Fidelity contends that the "key circumstances in this matter are . . . when Fidelity first decided it would sue Perkins" and whether "Perkins had a reasonable expectation that Fidelity would make a claim against it."  (Doc. 53 at 2-3).  Additionally, Fidelity notes that prior to 2008 it was not Fidelity's practice to sue its agents.  (See id. at 3 (citing Oswald Dep., Ex. A to Doc. 52, at 53-54); see also Doc. 25 at 24)).

Fidelity's arguments miss the mark.  The salient question is not whether Perkins tried to keep its actions "secret" from Fidelity, whether it expected that Fidelity would bring a claim against it for negligence or breach of the IAA, or whether Fidelity's usual practice was not to sue its policy-issuing agents on such claims.  See Coregis, 961 F. Supp. at 1579 (noting that the fact that law firm's client had not considered filing a malpractice claim against the firm prior to the effective date of liability policy was not relevant to question of whether firm had knowledge of potential of claim being filed by that client).  The issue is whether Perkins was aware before the Policy period of its actions surrounding the quitclaim deed that had resulted in Fidelity have to pay its title policy limits to Classic and whether those actions would provide an objective basis to believe that a claim could arise.  Without question, Perkins had such knowledge, and without question Perkins's actions provided an objective basis to believe that

a claim could arise.  See, e.g., Cuthill & Eddy, LLC, 784 F. Supp. 2d at 1343 (noting, in

finding that prior knowledge exclusion barred coverage, that "regardless of the subjective

beliefs Plaintiffs claim now to have held, the language of the [policy] precludes coverage for

the . . . claim because several insureds objectively 'had a basis to believe' that the [acts or

omissions at issue] 'might reasonably be expected to be the basis of a claim' prior to the

inception date of the policy").

Moreover, under Florida law a representation on an application need not be fraudulent

or intentional to serve as a basis for nonrecovery under an insurance policy.  A state

statute—section 627.409, Florida Statutes[13]—and judicial decisions applying it make clear

that even unintentional misstatements on an application may bar recovery.  See, e.g., Cont'l

Assur. Co. v. Carroll, 485 So. 2d 406, 409 (Fla. 1986) ("The plain meaning of [section

---

[13]This section provides in part:

Any statement or description made by or on behalf of an insured or annuitant in an
application for an insurance policy or annuity contract, or in negotiations for a policy or
contract, is a representation and is not a warranty.  A misrepresentation, omission,
concealment of fact, or incorrect statement may prevent recovery under the contract or policy
only if any of the following apply:

(a) The misrepresentation, omission, concealment, or statement is
fraudulent or is material either to the acceptance of the risk or to the hazard
assumed by the insurer.
(b) If the true facts had been known to the insurer pursuant to a policy
requirement or other requirement, the insurer in good faith would not have
issued the policy or contract, would not have issued it at the same premium
rate, would not have issued a policy or contract in as large an amount, or
would not have provided coverage with respect to the hazard resulting in the
loss.

§ 627.409(1), Fla. Stat.

627.409] indicates that, where either an insurer would have altered the policy's terms had it known the true facts or the misstatement materially affects risk, a nonintentional misstatement in an application will prevent recovery under an insurance policy."); <u>accord</u> <u>Kaufman v. Mut. of Omaha Ins. Co.</u>, 681 So. 2d 747, 750 n.5 (Fla. 3d DCA 1996) ("Under [section 627.409], the insurer is not required to demonstrate fraud[] but only needs to show a misrepresentation material to the risk assumed.  Even a nonintentional misstatement can bar recovery if material to the risk assumed." (internal citation omitted)).

In sum, even though Perkins may not have actually believed that Fidelity would sue it for negligence, Perkins was aware at the time of the insurance application of acts that could reasonably be expected to give rise to a claim against it.  Accordingly, the answer to Question 21 and the application condition prevent recovery under the policy.[14]

### B.  Knowledge of Wrongful Act Prior to Inception of Policy

The Policy provides that coverage is afforded for losses that Perkins becomes "legally obligated to pay for Claim or Claims first made against [Perkins] during the Policy Period by reason of any Wrongful Act by an Insured provided always that the Insured has no knowledge of such Wrongful Act prior to the Inception Date of this Policy."  Houston contends in its second argument that Perkins had knowledge of the subject Wrongful Act prior to the

---

[14]In addition to the "No" answer to Question 21, the "No" answer to Question 22 has also been raised.  That question, recounted in the text, asked whether any claims had been made against Perkins in the three years prior to the application.  The parties dispute whether the December 1, 2006 letter from Costa-Cruz's son's attorney constituted a "claim" against Perkins.  Because the Court's determination regarding the answer to Question 21 is sufficient to bar coverage and to grant summary judgment for Houston, Question 22 will not be separately addressed.  <u>See also</u> section III.C. <u>infra</u> of this Order.

Policy's inception date and that therefore there is no coverage.  This issue is largely duplicative of the application condition issue discussed in the prior section, and it also warrants grant of summary judgment in favor of Houston.

The Policy defines "Wrongful Act" as "any actual or alleged error or omission or breach of duty committed or alleged to have been committed or for [sic] failure to render such professional services as are customarily rendered in the profession of the insured." (Policy at 2).  The Wrongful Act upon which the claims against Perkins were based is the failure of Perkins to determine that the signature on the August 2005 quitclaim deed was forged despite information in its possession that could have led it to ascertain that fact.  As discussed in the previous section, it is clear from the undisputed record evidence that Perkins had knowledge of that Wrongful Act prior to the inception of the Policy.  Thus, coverage is also barred on this basis, and this provision supports a finding of no duty to defend or indemnify by Houston.

### C.  Claim Not First Made During Policy Period

In he third argument of its motion, Houston asserts that the claim was not first made against Perkins during the Policy period.  As earlier noted, the Coverage provision of the policy states in part that Houston will pay for losses that Perkins becomes legally obligated to pay for "Claims first made against the Insured during the Policy Period by reason of any Wrongful Act."  Houston argues that the Claim that resulted in the consent judgment was not first made against Perkins during the Policy Period—November 1, 2008 to November 1, 2009—but instead was made in December 2006 when Costa-Cruz's son's attorney sent the letter to Perkins asserting that the quitclaim deed contained a forged signature.  Fidelity

responds that Houston has never previously asserted this reason for denying coverage and, citing case law, argues that Houston therefore is estopped from now doing so for the first time.  Fidelity also contests this point on the merits.

Houston did not file a reply to Fidelity's response to Houston's cross-motion for summary judgment despite having the opportunity to do so.  Review of Houston's denial letters reflects that Fidelity is correct that Houston did not cite this basis for denying coverage.  Because Houston's other two arguments are dispositive of this case, the Court will not delve into this issue in detail but concludes that Houston has not established entitlement to summary judgment on this basis.

### IV.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.  The Motion for Summary Final Judgment (Doc. 22) filed by Fidelity National Title Insurance Company is **DENIED**.

2.  The Motion for Summary Judgment (Doc. 26) filed by Houston Casualty Company is **GRANTED**.  Houston Casualty Company has established that it is not liable on Fidelity's claim for breach of contract and that it is entitled to prevail on its counterclaim for a declaratory judgment of no duty to defend or indemnify its insured in the underlying state court lawsuit.

3.  The Clerk is directed to enter judgment providing that Plaintiff, Fidelity National Title Insurance Company, shall take nothing on the claim in its Complaint and that Defendant, Houston Casualty Company, has prevailed on its Counterclaim seeking a declaratory judgment that Defendant had no duty to defend or indemnify its insured—Perkins Real Estate

Services, Inc.—with regard to the claims asserted against Perkins in Case No. 07-CA-0017575-O in the Circuit Court of the Ninth Judicial Circuit for Orange County, Florida. Thereafter, the Clerk shall close this file.

   **DONE** and **ORDERED** in Orlando, Florida this 28th day of September, 2012.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record